**Opinion filed January 9, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00240-CR
_____

## TRAVIS SHAWN MONAGHAN, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 28835-A**

## M E M O R A N D U M   O P I N I O N

In a two-count indictment, Appellant, Travis Shawn Monaghan, was charged with the first-degree felony offense of aggravated robbery (Count One) and the second-degree felony offense of aggravated assault, by striking Gregory Webb on or about the head with his hand or an unknown object, causing Webb to sustain serious bodily injury (Count Two).  TEX. PENAL CODE ANN. §§ 29.03(a)(1), 22.02(a)(1) (West 2019 & Supp. 2024).  The jury acquitted Appellant of aggravated

robbery but found him guilty of aggravated assault. After Appellant pled "true" to the enhancement allegation, the jury assessed Appellant's punishment at thirty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced Appellant accordingly.

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence to support his conviction for aggravated assault. We affirm.

## I. *Factual Background*

On April 20, 2018, Webb's father received a phone call from an unknown number; a male whose voice he did not recognize made the call. The male caller told Webb's father that he had rescued Webb, who "had been beaten by two [B]lack people" and was severely injured. The caller then specifically requested that Webb's mother travel to Abilene to take Webb to a proper facility for medical care. Webb's father became suspicious of the caller, and because he lived approximately sixty miles from Webb, he called the Abilene Police Department (APD) to report that his son had been assaulted.

Around 2:40 a.m. the same day, APD Officer Brady Broyles was dispatched to Webb's apartment. Webb answered the door. According to Officer Broyles, it appeared that Webb had been recently assaulted—his left eye was almost swollen shut, and Officer Broyles observed that Webb appeared to be scared. Two other individuals, Appellant and James Sims, were also present in Webb's apartment. Webb told Officer Broyles that he had been assaulted "outside" in the apartment complex, and that he did not know what had occurred or who had assaulted him. Webb also told Officer Broyles that he wanted to go back to bed because he was in pain. While Officer Broyles was speaking with Webb, he noticed Webb signal to him that he wanted the other men to leave his apartment. Officer Broyles then instructed Appellant and Sims to step outside.

2

Officer Broyles spoke to Appellant outside the apartment. Officer Broyles testified that he "lost track" of the various explanations Appellant provided as to why he was at Webb's apartment that night. Initially, Appellant told Officer Broyles that "some guys . . . from upstairs" attacked Webb and that he came over to check on him. Later, Appellant stated that Webb went to "[the] wrong hookup" to get drugs and that an individual decided to "jack him." Appellant also told Officer Broyles that he was not present when Webb was assaulted. However, after Officer Broyles observed blood stains on Appellant's clothes and questioned Appellant about them, Appellant then told the officer that the blood on his shirt was from those who had jumped Webb.

Officer Broyles testified that Appellant was unable to recall Webb's name during their interaction, and he believed that Appellant "was under the influence of something" at that time. Officer Broyles took photographs of Appellant and Sims and instructed them to leave the premises. Officer Broyles then returned to the apartment to speak to Webb, but Webb did not answer the door. Officer Broyles's photographs of Appellant and Sims—as well as his body camera footage of his contact with Webb, Appellant, and Sims—were admitted and published to the jury at trial.

Around 4:00 a.m., APD Officer Jay Young[1] responded to a disturbance between Appellant and Sims near Webb's apartment. Officer Young observed blood on Appellant's breast pocket and stated that Appellant was unable to follow basic instructions. Officer Young searched Appellant's backpack and found a pill bottle of medication that belonged to Webb. At some point during their interaction, Officer Young determined that Appellant was "under the influence of some kind of

---

[1]Prior to trial, Officer Jay Shafer changed her name to Jay Young. We will refer to her as "Officer Young" in this opinion.

substance," and she arrested Appellant for public intoxication and possession of a dangerous drug. Officer Broyles was also present during the arrest. Appellant's arrest was captured and recorded by the dash camera in Officer Young's patrol unit and the recording was published to the jury at trial.

Dr. John Russell, an emergency physician, testified that he treated Webb's injuries on the afternoon of April 20. Dr. Russell recalled that Webb had multiple lacerations as well as maxillary and orbital fractures to his face. Based on the injury pattern to Webb's face, Dr. Russell believed that Webb had been struck about his face multiple times. Dr. Russell testified that Webb told him that he was walking his dog, "and he came in and at some point lost consciousness and woke up with ten unknown people in his home."

Dr. Russell testified that Webb's injuries were consistent with someone being struck by a blunt object. Dr. Russell stated that the types of injuries that Webb sustained were caused by a significant amount of force, and that he has observed similar injuries to patients that have been struck in the face with a pipe. According to Dr. Russell, it is more likely that Webb's injuries were caused by an object rather than a fist. Webb underwent facial reconstruction surgery to repair the damage that he suffered as a result of the assault. Dr. Russell opined that Webb's injuries constituted serious bodily injury, and that the object used to injure Webb was a deadly weapon.

On May 10, 2018, Webb contacted APD Detective Roger Romero to report that he was a victim of an aggravated assault that had occurred on or about April 20. Webb told Detective Romero that he was in his bedroom when he was struck several times, causing him to lose consciousness. Webb told Detective Romero that he did not see who struck him, but he believed it was Appellant because they had been arguing, and Appellant was the only other person in the apartment at the time he was struck. Webb also told Detective Romero that a necklace, watch, and $100 in cash

had been stolen from his apartment after he was assaulted. The next day, Detective Romero went to Webb's apartment to take photographs of the scene and locate evidence of the assault. Detective Romero recovered bloodied bedding and pillowcases from Webb's bedroom, and he photographed blood spatters that were present on the walls and ceiling of Webb's bedroom.

On May 17, 2018, Detective Romero interviewed Appellant at the Taylor County jail. During the interview, Appellant denied knowing Sims or Webb, and denied being at Webb's apartment on April 20. Detective Romero did not observe any injuries on Appellant. Detective Romero collected a buccal DNA swab from Appellant and retrieved Appellant's property, including his clothes, from the county jail's inventory. In doing so, he observed that Appellant's clothes appeared to be the same clothes that he was wearing as shown in Officer Broyles's April 20 body camera footage. Additionally, Detective Romero testified that Webb's missing watch, necklace, and pill bottle were included in Appellant's jail property; however, the $100 that Webb reported missing was not there. Detective Romero submitted blood samples from Webb's pillowcases, Appellant's clothes, and the buccal swabs from Webb and Appellant to the Texas Department of Public Safety Crime Laboratory for forensic testing and DNA comparison. The test results noted in the DNA lab report showed that Webb was most likely the contributor of the blood on Appellant's jeans and shirt.[2]

Detective Romero testified that the statements Webb made to him on May 10—that Appellant had assaulted Webb in Webb's apartment bedroom—was consistent with the evidence that he had collected during the investigation. Detective Romero also obtained a recorded jail telephone call from Appellant to another

---

[2]The lab report showed that it was "134 septillion times more likely" that the blood on Appellant's jeans came from Webb, rather than an unknown individual, and "78.3 septillion times more likely" that the DNA on Appellant's shirt came from Webb, rather than an unknown individual.

person, dated April 17, 2023, where Appellant can be heard saying that "if [Webb] shows up I'm f----d."

Sims testified that he met Appellant on Grindr, an online dating app, several months prior to April 20, but had only spent time with Appellant in person once or twice. On April 19, Appellant invited Sims to Webb's apartment. When Sims arrived at Webb's apartment, "[i]t was still daylight."

Sims testified that Appellant let him into Webb's apartment; Sims "was high when [he] got there." Sims noticed that Webb had significant injuries on his face and was bleeding from his lip. According to Sims, Webb looked "like he was scared of [Appellant]." Sims also testified that Appellant "had blood on his clothes when [Sims] got there," but it appeared that Webb had just showered because his hair was wet. Sims, who admitted that he was "pretty intoxicated or under the influence of narcotics that night," stated that all three of them used drugs at Webb's apartment—Sims used methamphetamine and marihuana, Appellant used methamphetamine, and Webb was "smoking dope." When Sims asked Appellant where the "blood all over him" came from, Appellant told Sims that Webb was jumped by two Black men "at some check cashing place." Appellant told Sims that he "jumped in to help [Webb]" and that the blood stains on his shirt were from "the dudes that he almost beat to death that had attacked [Webb]."[3] Sims confirmed that Appellant called Webb's mother while they were at the apartment, and stated that, at some point, Appellant and Webb went into Webb's bedroom for approximately thirty minutes.

After Officer Broyles told Sims and Appellant to leave, they began walking along a nearby road. While they were walking, Appellant—unprovoked—struck

---

[3]Sims also testified that he previously stated under oath that Webb told him "he went to a check cashing place or something and two [B]lack guys jumped him, and I guess [Webb] called [Appellant] to come over there and help him." At trial, Sims clarified that Webb made this statement when Webb repeated the same story that Appellant had told to Sims.

Sims several times on the head with a collapsible baton that he had in his jeans pocket. After the attack, Appellant threw the collapsible baton into a field. Sims recalled Officer Young and Officer Broyles arriving and arresting Appellant; Sims then went to the hospital to get stitches for his injuries.

Webb testified that he first communicated with Appellant around mid-afternoon on April 19 through Grindr. The two arranged to meet, and ultimately went back to Webb's apartment. Webb, who was "coming down" from using drugs earlier in the day, left his apartment to get cocaine and Xanax for Appellant. After retrieving the drugs for Appellant, Webb returned, and Appellant began "snort[ing] the cocaine" in Webb's bedroom while it was still daylight.

Appellant began getting "aggressive" because "[he] wanted more drugs" and wanted to invite another person to Webb's apartment. Webb "remember[ed] [Appellant] getting upset with [him] because [Appellant] didn't get what he expected." The "last thing [Webb] remember[ed]" before losing consciousness was sitting on his bed while Appellant was sitting on the floor, leaning against the wall, three feet away.

Webb regained consciousness in his bedroom several hours later when it was dark outside, approximately thirty minutes before Officer Broyles arrived. Webb testified that he was "in a lot of pain," had a bag of frozen peas on his face, was bleeding from his eye and nose, and noticed blood on his pillow. Webb remembered seeing blood in various places around the bedroom and that Appellant was the only other person in his apartment just before he lost consciousness. Webb believed that Appellant put the bag of frozen peas on his face "to help with the swelling."

Webb walked into the living room and saw Appellant on the sofa "snorting cocaine off [the] coffee table" and Sims painting his fingernails. Webb said that he did not know how Sims got into his apartment. Webb stated that he and Appellant were almost out of drugs when he passed out, but there were more drugs in the

apartment when he regained consciousness. When Webb asked Appellant what happened, Appellant told him that two Black men "beat[] [him] up." Webb, "disoriented and confused," repeated Appellant's version of events to Officer Broyles when he arrived thirty minutes later; Webb regained his memory a few days after the assault.

Webb's parents photographed his injuries on April 20, which show Webb bleeding from his eye. Webb testified that his nose, septum, and jaw were broken, and his "eye . . . was crushed" as a result of the assault. Webb did not know why he told Dr. Russell that ten people had beaten him because, at the time, he had no memory of what had occurred that night. Webb testified that he was missing a silver necklace and a watch after he was assaulted, and that these items were later recovered from Appellant's property at the Taylor County jail.

Webb testified that he later discovered that he was missing $100 from his wallet. Webb explained that he waited until May 10 to contact law enforcement because he was worried about getting in trouble for his drug use. However, Webb's parents encouraged him to contact law enforcement after seeing the extent of his injuries and speaking to the doctors who were treating Webb. Webb stated that he and a friend's housekeeper cleaned his bedroom and collected his bloodied sheets prior to Detective Romero's arrival at the apartment. According to Webb, Appellant came to Webb's house prior to trial to ask whether Webb was HIV positive because Appellant had "busted [his] knuckles" from "beat[ing Webb's] a-s" and had Webb's blood on his hands.

## II. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–

89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762 ("[A] reviewing court does not sit as a thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Garcia*, 667 S.W.3d at 761 (quoting *Jackson*, 443 U.S. at 319). Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762.

We treat direct and circumstantial evidence equally under this standard. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13

(Tex. Crim. App. 2007)); *Lee*, 676 S.W.3d at 915. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Rather, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

### III. *Analysis*

In his sole issue on appeal, Appellant argues that there is legally insufficient evidence to support his conviction for aggravated assault. Specifically, Appellant asserts that the evidence presented at trial was "too speculative" to support the jury's determination that Appellant assaulted Webb.

As relevant to this appeal, a person commits the offense of aggravated assault if he "intentionally, knowingly, or recklessly causes 'serious' bodily injury to another." PENAL §§ 22.01(a)(1), 22.02(a)(1); *Wade v. State*, 663 S.W.3d 175, 183

(Tex. Crim. App. 2022). Here, Appellant does not challenge the sufficiency of the evidence to support the jury's finding that Webb's injuries constituted "serious bodily injury."[4] *See* PENAL § 1.07(46). Rather, Appellant argues that the evidence was "too muddled" for the jury to have rationally concluded that Appellant was guilty of aggravated assault because: (1) Sims's and Webb's accounts "substantially contradict[ed]" each other; and (2) Webb's testimony of the assault—including Webb's statements that he remembered Appellant assaulting him—"materially and fatally contradict[ed] itself."

"Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring); *Luna v. State*, 687 S.W.3d 79, 93 (Tex. App.—Eastland 2024, pet. ref'd). A jury may infer intent and knowledge from any facts that tend to prove its existence, "including the acts, words, and conduct of the accused," the method the defendant uses to commit the offense, and "the nature of wounds inflicted on the victims." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique*, 994 S.W.2d at 649). Further, a perpetrator's identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence presented at trial. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). Based on our review of the record, we conclude that a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant intentionally, knowingly, or recklessly caused serious bodily injury to Webb.

---

[4]Nevertheless, had Appellant challenged the sufficiency of evidence as to whether Webb's injuries constituted "serious bodily injury," we would conclude that sufficient evidence exists in the record to support the jury's determination. *See Wade*, 663 S.W.3d at 188; *Goodman v. State*, 710 S.W.2d 169, 170 (Tex. App.—Houston [14th Dist.] 1986, no pet.) ("Were it necessary to so hold, we would hold that a skull fracture in and of itself is a serious bodily injury.").

Webb testified about the facts and circumstances of his assault. On April 19, he contacted Appellant through an online dating website, the two met, and they went back to Webb's apartment. After Appellant indicated that he wanted to use drugs, Webb left to purchase drugs while Appellant stayed inside the apartment. Webb then returned to his apartment with drugs, locked the door, and Appellant used the drugs that Webb had purchased. While they were in Webb's bedroom, Appellant became aggressive because he wanted more drugs and wanted to invite Sims to come to the apartment. Webb testified that "the last thing [he] remember[ed]" before he lost consciousness was Appellant holding a syringe. Later at trial, Webb testified that he remembered seeing Appellant strike him before he lost consciousness, but he stated that he did not know what Appellant had used to strike him. Webb woke up in his bedroom with injuries to his face. Appellant was the only person in Webb's bedroom when he lost consciousness. Webb stated that the drugs were almost gone when he passed out, but once he awoke, he saw that Sims was in his living room and there were more drugs in the apartment.

Additionally, Webb explained his conflicting statements to Officer Broyles, Dr. Russell, and Detective Romero. First, Webb admitted that he told Officer Broyles that he was attacked by unknown individuals; however, Webb testified that he made this statement to Officer Broyles because that is what Appellant told him had occurred when he regained consciousness. Second, Webb testified that he did not remember telling Dr. Russell that he lost consciousness and woke up with ten unknown people in his home after walking his dog—although Webb also stated that he "[did not] know if [his statement to Dr. Russell] was true or not." According to Webb, he did not regain his memory of the assault until a few days after the assault had occurred. Finally, when asked about the general circumstances of his assault and what he reported to Detective Romero on May 10, Webb maintained that he was alone in the bedroom of his apartment with Appellant when he was assaulted.

12

Detective Romero observed stains in Webb's bedroom that he believed were blood and collected the stained pillowcases from Web's bedroom for forensic testing. Detective Romero also collected the clothes that Appellant was wearing on April 20, a buccal swab from Appellant, and blood samples from Appellant's shirt, pants, and Webb's pillowcase. Forensic testing revealed that there was a strong likelihood that the bloodstains on Appellant's shirt and pants came from Webb. Further, the photographs taken by Detective Romero depicted the blood stains on Webb's bedroom walls, bedsheets, and Appellant's clothing.

Detective Romero testified that he believed Webb was assaulted by Appellant in the bedroom based on Appellant being the only individual in Webb's apartment at the time of the assault, and the presence of Webb's blood on Appellant's clothes. In light of the evidence presented at trial, and any reasonable inferences to be derived from the evidence, the jury, as a rational trier of fact, could have logically inferred and found beyond a reasonable doubt that Appellant committed aggravated assault against Webb. *See Jackson*, 443 U.S. at 318–19; *see also Ingerson*, 559 S.W.3d at 509; *Bin Fang v. State*, 544 S.W.3d 923, 929 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("A rational jury could infer that appellant acted knowingly because a person would be aware that beating someone with a fist is reasonably certain to cause bodily injury.").

Appellant's statements further support the jury's finding of guilt. Webb testified that Appellant admitted to assaulting him when Appellant stated that he needed to know if Webb was HIV positive because he "busted [his] knuckles" and "had [Webb's] blood on his hands" from "beat[ing Webb's] a-s." In a recorded telephone call from the Taylor County Jail on April 17, 2023, Appellant told someone during the call that, if Webb shows up to trial, "I'm f----d" and going to prison. Appellant's recorded statements on the jail call thus indicate a consciousness of guilt from which a rational jury could have also determined Appellant's

13

culpability. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) ("[A]ny conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged.").

Finally, Officer Broyles, Detective Romero, Sims, and Webb each testified about the various statements that Appellant made concerning Webb's assault. Appellant told Officer Broyles that he was not present when Webb was assaulted, and that he was only at the apartment to check on Webb after Webb told him that he was attacked by "some guys . . . from upstairs." After Officer Broyles noticed blood stains on Appellant's clothing, Appellant told Officer Broyles that Webb went to the "wrong hookup" to purchase drugs and got "jack[ed]." Also, Appellant could not recall Webb's name when he was speaking to Officer Broyles. When Appellant was interviewed by Detective Romero at the jail, Appellant denied knowing Webb or Sims, and denied being at Webb's apartment on April 20. Officer Broyles's body camera footage and the video recording of Detective Romero's interview with Appellant corroborate their testimony. Further, Sims and Webb testified that Appellant told them that Webb was injured when he was attacked by two Black males; Sims also testified that Appellant said Webb was attacked at a check cashing business.

With respect to Appellant's argument that the evidence was too contradictory and inconsistent to be credible, it is well-settled that the jury may believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. As the trier of fact, it is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S.

at 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. Therefore, when the evidence supports conflicting inferences, we presume that the jury, as the factfinder, resolved any conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

We have reviewed the evidence in the light most favorable to the jury's verdict, as we must, and we conclude that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of aggravated assault, as charged in Count Two of the indictment. Accordingly, we overrule Appellant's sole issue on appeal.

IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER<br>JUSTICE

January 9, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.